UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-61763-Civ-MARRA/JOHNSON

MT. HAWLEY INSURANCE COMPANY,
an Illinois insurance company,
and JAMES RIVER INSURANCE COMPANY,
a Delaware insurance company

    Plaintiffs/Counter-Defendants

vs.

PALLET CONSULTANTS CORPORATION,
a Florida corporation, and P.C. REALTY
OF FLORIDA, LLC, a Florida limited
liability corporation

    Defendants/Counter-
    Plaintiffs/Third-Party Plaintiffs

vs.

SIMPLEXGRINNELL LP, a Delaware
limited partnership

    Third-Party Defendant.
_____/

## ORDER AND OPINION GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Third-Party Defendant SimplexGrinnell LP's Motion For Summary Judgment and/or Partial Summary Judgment [DE 159]. The motion is fully briefed and ripe for review. The Court has carefully considered the relevant filings, and is otherwise fully advised in the premises.

Pallet Consultants Corporation and P.C. Realty of Florida, LLC (collectively "Pallet" or "Third-Party Plaintiffs") filed a third-party breach-of-contract claim

against SimplexGrinnell LP ("SimplexGrinnell") alleging that a fire caused extensive damage to Pallet's property as a result of SimplexGrinnell's failure to restore service to Pallet's sprinkler system. SimplexGrinnell moves for summary judgment against Pallet on all claims asserted in Pallet's Third-Party Complaint ("Complaint").

## UNDISPUTED MATERIAL FACTS

Pallet owns, leases and/or operates a business located at 951 S.W. 12th Avenue, Pompano Beach, Florida (the "Property"). As a result of Hurricane Wilma, the fire-sprinkler system located at the Property was damaged and became inoperable. Gamez Depo. at 21. Because the hurricane broke the sprinkler pipes, Pallet had shut off either one or two valves supplying water to the fire sprinkler system. Gamez Depo. at 25-26. Thus, when Inspector Aaron Efferstein ("Efferstein") of the Pompano Beach Fire Prevention Bureau inspected the Property on January 9, 2006, he found that the southwest riser had been turned off at the valve. Efferstein Depo. at 18-21 and Ex. 2A (Jan. 9, 2006 report). Efferstein asked Pallet to repair the sprinkler system and in the meantime keep a "fire watch" in the occupied parts of the buildings whenever people were present (*id*., at 34-35), as well as put a sign on the southwest riser indicating that it was not functional. *Id*. at 21.

The Fire Department gave Pallet a list of required repairs that needed to be done to the sprinkler system "in order to keep the business going." Gutierrez Depo. at 43. One of these requirements was to repair the sprinkler system piping and make the sprinkler system functional. Gamez Depo. at 30. As a result, Pallet's General

Manager John Gamez ("Gamez") contacted SimplexGrinnell requesting the service needed to comply with the Fire Department's requirements. Gamez Depo. at 30-31. Additionally, Gamez requested that the inspector for the Fire Department contact SimplexGrinnell and request service to fix the problems identified by the inspector. Gamez Depo. at 30-31. SimplexGrinnell's Sprinkler Service Manager Coby Tarr ("Tarr") received the request for service and arranged for SimplexGrinnell to examine the Property. Tarr Depo. at 13-14.

On January 10, 2006, Pallet contracted with SimplexGrinnell to perform the repairs to Pallet's fire protection/sprinkler systems and to "turn all the water back on to the two (2) systems in the building." DE 137, Ex. I, Compl. ¶¶ 7-8; *see also* Contract. SimplexGrinnell's Sprinkler Service Sales Representative, Brian Grabenhorst ("Grabenhorst"), who prepared the contract for Pallet, described the purpose of the contract stating, "what they [Pallet] were looking to do was put the system back in service." DE 137, Ex. J at 11. Grabenhorst further stated, "the point of the work we [SimplexGrinnell] were doing was to turn the water back on." Grabenhorst Depo. at 27.

Grabenhorst subsequently gave sworn testimony to the State of Florida fire officials that:

> We were going to replace that branch line and then put the system back in service. We also noticed a two-and-a-half inch piece of the main that went up and over a pipe that had blown sideways, and he wanted that straightened up so it looked proper. We were going to do those three items. We were going to cap off the two four-inch mains, replace the

> missing portion of the branch line and straighten up the two-and-a-half inch main, all in order to turn the City pressure - the City water back on to the system so the systems were active again.  That is what we were contracted to do.

DE 137, Ex. J at 12.

On January 10, 2006, Grabenhorst faxed a three-page[1] service contract (the "Contract") to Pallet.  Grabenhorst Aff. ¶ 3.  Sometime after January 10, 2006, Gamez agreed to the terms and conditions of the Contract by signing his name to the second page of the Contract and returning it to Grabenhorst.  Grabenhorst Aff. ¶ 4; DE 159 -8, Ex. G.  On the second page of the Contract, just below the signature of Pallet's General Manager Gamez, Pallet acknowledge and agreed to the terms and conditions of the Contract and agreed that the Contract included an additional page after the signature page:

> THIS AGREEMENT CONSISTS OF THIS AGREEMENT PAGE AND THE TERMS AND CONDITIONS ON THE REVERSE SIDE HEREOF OR ATTACHED HERETO, and is the complete agreement between the parties.  Customer acknowledges that he has read this agreement, understands it, and agrees to be bound by its terms and conditions.

DE 159, Ex. E-G.

---

[1] Pallet states in its opposition memorandum that "SimplexGrinnell did not fax to Pallet the 'reverse side' document containing the various limiting language and the Massachusetts choice of law provision."  DE 167 at 10, *see also* at 8.  Oddly, these statements have no citation to deposition testimony or any other form of evidence.  Since Pallet's contention is not supported by *any* evidence in the record, Grabenhorst's affidavit, along with a copy of the fax cover sheet (indicating 4 pages were faxed), the three-page Contract, and the fax-confirmation sheet showing that four pages were faxed, remain undisputed material facts.  *See* DE 159, Ex. E and F.

The first page of the Contract included a negotiated limitation-of-liability:

> Please also note that SimplexGrinnel will not be liable, nor held responsible for any damage that may occur as a result of turning the water back on, as there is no way to determine the integrity of the entire system prior to re-pressurizing the system.  The two (2) systems are only connected to a local alarm bell.  There is no electronic monitoring of the fire sprinkler systems at this location.  Should there be any type of water flow after hours, SimplexGrinnel will not be liable, nor held responsible for any damage that may result.

DE 159-7, Ex. F.  The third page of the Contract included a one-year limitation-of-action and choice-of-law provision which stated in pertinent part:

> It is agreed that no suit, or cause of action or other proceeding shall be brought against either party more than one (1) year after the accrual of the cause of action or one (1) year after the claim arises, whichever is shorter, whether known or unknown when the claim arises or whether based on tort, contract, or any other legal theory.  The law of Massachusetts shall govern the validity, enforceability, and interpretation of this Agreement.

*Id*.  The third page of the Contract included a liquidated-damages provision which stated in pertinent part:

> SimplexGrinnell and the CUSTOMER agree that it is impractical and extremely difficult to fix actual damages which may arise to the faulty operation of the System(s) or the failure of any SimplexGrinnell device or failure to perform, or negligent performance of Work; if, notwithstanding the above provisions, there should arise any liability on the part of SimplexGrinnell, such liability shall be limited to an amount equal to the Agreement price allocable to the site where the incident occurred.  Such sum shall be complete and exclusive and shall be paid and received as liquidated damages and not as a penalty.

*Id*.  The second page of the Contract, just beneath Grabenhorst's signature, included a limitation-of-liability provision limiting Pallet's recoverable damages to the Contract price, *i.e.*, not to exceed $875.00:

> CUSTOMER AGREES THAT SIMPLEXGRINNELL'S LIABILITY FOR
> THE PERSONAL INJURY, DEATH OR PROPERTY DAMAGE,
> WHETHER ARISING IN CONTRACT, TORT, STRICT LIABILITY
> OR OTHERWISE, SHALL NOT EXCEED THE AGREEMENT PRICE
> SET OUT ABOVE. . .
>
> *****
>
> CUSTOMER FURTHER AGREES THAT SIMPLEXGRINNELL SHALL
> NOT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR
> CONSEQUENTIAL DAMAGES OR ANY ECONOMIC LOSS
> DAMAGES OF ANY KIND AND THAT THE CUSTOMER SHALL
> HOLD SIMPLEXGRINNELL HARMLESS FROM ANY AND ALL
> THIRD PARTY CLAIMS RELATING TO THE CUSTOMER'S
> FAILURE TO MAINTAIN THE SYSTEMS OR TO KEEP THEM IN
> OPERATIVE CONDITION OR RELATING TO
> SIMPLEXGRINNELL'S PERFORMANCE OR FAILURE TO
> PERFORM UNDER THIS AGREEMENT.

*Id*.

On January 13, 2006, SimplexGrinnell sent its employee David Vazquez to work on the sprinkler system.  When Vazquez arrived, there was tape around the valves indicating that they were shut.  Vazquez thought the fire department had placed the tape there so he did not re-open them.  Vazquez Depo. at 34-35, 61-62; *see also* Gamez Depo. at 11.  The work order indicated that he was supposed to repair and "refill," or turn on, the sprinkler system.  Vazquez Depo. at 31-32 and Exs. 2-A, 2-B.  However, Vazquez was only able to cap the broken pipes and remove the broken pipe

over the loading dock.  *Id.* at 30-35.  Because he could not tell which sprinkler lines were supplied by the valves, Vazquez did not turn on the system at either riser.  *Id.*

Pompano Beach Fire Prevention Bureau Efferstein returned for a follow-up inspection on January 16, and found that the system had been repaired to the break points, but noted that "the roof and sprinkler for the southeast [sic][2] area is shut down, but needs to be repaired."  Efferstein Depo. at 31-34 and Ex. 2D.  He also noted that the missing pipe in the northeast section needed to be replaced, but he did not note that the sprinkler system was shut down in that area.  *See id.*, Ex. 2D.

Efferstein returned again on January 30, 2006.  On that day the riser supplying the southwest portion of the building was still shut down.  Efferstein Depo. at 36-39 and Ex. 2E.  The warning sign on the system riser servicing the southwest portion of the building was missing, so Efferstein ordered Pallet to replace it.  *Id.* at 38.

On February 16, 2006, SimplexGrinnell sent Sam Salazar to work on the sprinkler system.  Salazar Depo. at 11-12; Tarr Depo. at 14-15, 23, 27.  Salazar testified that he had never been to the Property before, was unaware that someone from SimplexGrinnell had already worked on the sprinklers there, and that he had not been shown the work order prior to his arrival.  His understanding was that he was there to install a replacement pipe over the loading dock on the north side.  Salazar Depo. at 13-14 and Ex. 2A.  He testified he did not believe he was there to do any

---

[2] Efferstein testified that what he meant was "southwest."  Efferstein Depo. at 33, 38.

work on the southwest riser or sprinklers (*id*. at 15-19, 16-17, 25, 28-29) and that he did not do so. *Id*. at 20-24, 28. The north side riser supplying the loading dock was on, so he had to turn off that riser in order to replace the pipes (*id*. at 14-16, 23-24). When he completed his work, Salazar turned that riser back on. *Id*. at 16. The valve on the southwest section riser was closed, and had caution tape around it. *Id*. at 16, 24. Salazar did not open it. *Id*. at 19-20. He attempted to find a Pallet employee to warn of the closed valve, but could not find anyone, so he warned an unidentified tenant. *Id*. at 20-21, 25-26.

Pallet was advised that the work was complete and Pallet paid the total due under the Contract. DE 137, Ex. L at 26, 31; Ex. G at 65. Pallet understood SimplexGrinnell's representation of completion to mean that SimplexGrinnell had performed its scope of work as set forth in the contract: that it had completed the repairs and turned the water back on to the systems. DE 137, Ex. G at 63-64.

Grabenhorst, Tarr, as well as Salazar, all testified that if a SimplexGrinnell technician ever leaves a property without turning all the water back on, they are required to affix a specific "non-working conditions" sticker to the work order and have the client sign off on it. DE 137, Ex. L at 20; Ex. K at 45-46; Ex. N at 27-28. Specifically, Grabenhorst explained:

> It was our internal procedure that if you were going to walk away from a job and leave the water turned off, the technicians were actually given rubber stamps and you would stamp the work ticket and make sure the customer was aware that the water was turned off so the customer could either provide fire watch or make some arrangements or ask you to stay overtime, whatever the case may be.

DE 137, Ex. K at 45.  The work order for this job contained no such notification and no such sign-off was ever requested or provided.  DE 137, Ex. N at 27-29.

Tarr confirmed that SimplexGrinnell performed its contracted work, including turning the water to the systems back on, stating:

> And by [Salazar] stating "completed," and not indicating with the liability sticker, I took it everything is back up and running and everything is on service . . . so I'm led to believe that it's completed on 2/16 and we're done and ready to send invoicing.

DE 137, Ex. L at 26.  Tarr also stated under oath to State of Florida fire officials that SimplexGrinnell's technicians "capped the system, put the system back in service and left the site."  DE 137, Ex. J at 19.

Pallet states that it had no knowledge that SimplexGrinnell may have failed to turn the southwest sprinkler systems back on.  Rather, it relied on SimplexGrinnell's representation that the work had been completed and, therefore, believed the system was operational as of the date of the fire.  DE 137, Ex. A at 40.  It only came to light that Pallet's southwest sprinkler system was off on February 16, 2007, in contradiction to the testimony of Tarr, after this litigation ensued and Salazar was deposed.  Salazar testified that he did not turn the southwest sprinkler system on because his work order did not relate to the southwest sprinkler system, and that system was off and wrapped in caution tape.  DE 137, Ex. N at 15-16, 25.  Prior to his deposition, Salazar had not advised any Pallet employee or representative that the water to the southwest sprinkler system was off.  DE 137, Ex. N at 26-27.

On March 3, 2006, Pallet suffered catastrophic damage as a result of a fire at the Property. Pallet filed an insurance claim for its policy limits of $5,415,805 for the damages incurred in the fire. DE 167, Ex. G.

After the fire, several agencies participated in the investigation of the fire. A report issued by the Florida Division of the State Fire Marshal concluded that "lack of adequate functional fire protection systems" was a contributing factor to the spread of the fire. Esslinger Depo. (March 6, 2006 Florida Division of State Fire Marshal ACISS Primary Investigation Report) at 11. The report noted a sign reading "Sprinkler System Out of Service Emergency Contact 954-410-2693" on the sprinkler stand pipe. *Id.* at 8.

Similarly, a Report of the Florida Bureau of Fire Prevention concluded:

> As noted in Fire Inspection Report dated 1/30/06, the OS&Y controlling the water supply to the southwest portion of the building was shut down. Observations at the time of the fire investigation confirm that the south OS&Y was still shut and wrapped with fire scene tape. No information obtained during this sprinkler investigation indicated that the OS&Y was in the open position and the water supply restored to the southwest sprinkler piping from 1/30/06 until 3/6/06.

Parks Depo. at 7.

Mt. Hawley's expert, Dan Arnold, inspected the fire scene on March 29, 2006. Arnold Depo. at 8. Arnold found water washmarks on the sprinkler branch lines in the northeast section of the building, but no such marks were present in the southwest section. Arnold Rpt. at 5. He further observed that the sprinkler pipes northeast

section were straight, and in some cases, intact. *Id*. By contrast, the sprinkler pipes in the southwest section of the building were severely bent and distorted from heat, and the sprinklers were melted away from their outlets. *Id*. at 4. In addition, Arnold found that the valve operating the southwest riser had tape around it. *Id.*

Arnold concluded that the sprinkler system did operate in the northern part of the building, but did not operate in the southwest part of the building. *Id*. at 5-6. Mt. Hawley subsequently sent a letter to Pallet in which it denied coverage for its fire claim stating that Pallet allegedly violated the policy's Protective Safeguard Endorsement which requires that Pallet maintain its fire sprinkler system in "complete working order." Mt. Hawley concluded that Pallet failed to maintain its fire sprinkler system in complete working order because the valve supplying water to one of its two systems was closed or in the "OFF" position at the time of the fire. Compl. ¶¶ 18, 21. Pallet sent SimplexGrinnell a demand letter following the Salazar deposition and after receiving no response, filed its Motion for Leave to Amend and its Third Party Complaint on February 4, 2008.

In its Complaint, Pallet alleges that SimplexGrinnell breached its duties under the Contract by failing to restore service to all portions of the sprinkler system at the Property. Compl., ¶¶ 7-17. Pallet alleges it has been denied insurance coverage for the damages occurring as a result of the fire on March 3, 2006.

## STANDARD OF REVIEW

A court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(c), which states, in relevant part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).  The moving party bears the burden of meeting this exacting standard.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  That is, "[t]he moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex*, 477 U.S. at 323).  In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party.  *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994).

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must

establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position. A jury must be able reasonably to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986); *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Moreover, the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). "The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment." *Henderson v. Carnival Corp.*, 125 F. Supp. 2d 1375, 1376 (S.D. Fla. 2000).

## DISCUSSION

Pallet filed a third-party breach-of-contract claim against SimplexGrinnell alleging that a fire caused extensive damage to Pallet's property as a result of SimplexGrinnell's failure to restore service to Pallet's sprinkler system. SimplexGrinnell seeks summary judgment or partial summary judgment on all claims asserted in Pallet's Third-Party Complaint on the following grounds:

1. Pallet's claims are precluded by written contract;

2. Pallet's claims are contractually limited to $875.00 in recoverable damages.

    3.    Pallet's claims are untimely; and

    4.    Pallet cannot establish proximate causation because its own expert, Alfred Longhitano, concluded that Pallet's alleged damages would have occurred regardless of any alleged conduct by SimplexGrinnell;

<u>Third Page of Contract</u>

SimplexGrinnell's motion for summary judgment relies upon terms contained on what it refers to as the "reverse side" or third page of the Contract. Pallet asserts that there is a disputed issue of material fact as to whether Pallet received this "reverse side" when Pallet signed the Contract. Pallet asserts that SimplexGrinnell did not include this "reverse side" in contracting with Pallet and therefore, the contents of the "reverse side" are inapplicable and should not be considered by the Court. The Court rejects this assertion for several reasons.

First, as stated in footnote 1 above, Pallet cannot credibly argue that it did not receive and/or agree to the provisions on the third page of the Contract because Pallet provides no affidavit, deposition testimony, or any other evidence to support such a proposition. SimplexGrinnell has provided the uncontroverted affidavit of SimplexGrinnell's Service Sales Manager, Brian Grabenhorst, who has sworn that he sent a four page fax to Pallet, which fourth page was the "reverse side" of the Contract. See DE 159, Ex. E and 1. Pallet has not provided even a scintilla of evidence that contradicts or is inconsistent with Grabenhorst's Affidavit.

Second, the signature page of the Contract submitted by both Pallet and SimplexGrinnell indicates that Pallet acknowledged and agreed at the time of

contracting that there were "terms and conditions on the reverse side hereof or attached hereto . . . [and that Pallet] has read this agreement, understands it, and agrees to be bound by its terms and conditions."

Third, the fax cover sheet for the Contract indicates that the document faxed by SimplexGrinnell to Pallet consisted of four pages, including the cover sheet. DE 159, Ex. E-G. And finally, the fax-confirmation sheet submitted by SimplexGrinnell indicates that the Contract faxed by SimplexGrinnell to Pallet was four pages long. DE 159-7, Ex. F.

Because Pallet has introduced no evidence to establish that the "reverse side" of the Contract was not included in the four page facsimile sent by SimplexGrinnell to Pallet, Pallet has not created a disputed issue of material fact and this page of terms and conditions is part of the Contract as a matter of law.

Pallet's Claims are Contractually Limited to $875.00 in Damages

Next, the limitation-of-liability provision in the Contract establishes that SimplexGrinnell's liability would not exceed the Contract price of $875.00. Pallet argues that this limitation of liability provision is unenforceable because it either violates Florida public policy or because it conflicts with other exculpatory language on the first page of the Contract. The Court rejects both arguments.

In support of its argument that the limitation-of-liability provision on the signature page violates Florida public policy, Pallet cites inapplicable statutes governing the state fire marshal's ability to enact ordinances regarding fire safety

standards and to regulate the licensing of fire protection companies.  These statutes do not create a private right of action or otherwise affect the enforceability of risk-allocation provisions.

Pallet also cites a Florida case, *Loewe v. Seagate Homes, Inc.*, 987 So.2d 758 (Fla. Dist. Ct. App. 2008), for the proposition that risk-allocation provisions in fire-protection contracts are unenforceable because such provisions are "repugnant and unconscionable to Florida's public policy and . . . undermine the intent of the Florida legislature . . ." DE 167 at 17-18.  In *Loewe*, the court held that the exculpatory clause at issue was "obviously unenforceable to the extent that it attempt[ed] to release [the defendant] of liability for an intentional tort." 987 So.2d at 760-61.  The court further held that "[r]egardless of whether the [plaintiffs] are ultimately able to establish a code violation, we find that the exculpatory clause is unenforceable to the extent it purports to absolve [the defendant] of liability for personal injuries to [the plaintiff].  *Id.*  In explaining its decision, the court noted that "Florida's comprehensive regulation of the licensing of building contractors and building construction standards reflect a clear public policy to protect purchasers of residential homes from personal injuries caused by improper construction practices." *Id.*

Here, Pallet has not alleged that SimplexGrinnell committed an intentional tort or caused any personal injuries.  The present case does not involve the purchase or construction of a residential home, and the parties to the Contract in this case are

both commercial enterprises with relatively equal bargaining power. The holding in *Loewe* is inapplicable to the facts of this case.

Pallet also argues that the limitation-of-liability provision on the signature page should not be enforced because it conflicts with exculpatory language on the first page of the Contract. On the first page of the Contract, the parties agreed that SimplexGrinnell would bear no liability for any water damage occurring as a result of SimplexGrinnell turning the water back on to the sprinkler system. This exculpatory language, by its terms, applies only to any water damage that might have occurred when SimplexGrinnell re-pressurized the sprinkler system. Pallet has not alleged that it sustained any water damage as a result of SimplexGrinnell turning on the water. To the contrary, Pallet alleges that it sustained fire damage caused by the failure of SimplexGrinnell to turn the water back on - a situation that falls outside the scope of the limitation language on the first page of the Contract. Indeed, this provision favors SimplexGrinnell by limiting its liability. It does not impose any liability on SimplexGrinnell. Moreover, there is no inconsistency between the two provisions. The fact that the parties agreed to limit liability under certain circumstances is not inconsistent with a separate provision that places a cap on the amount of damages that are recoverable where liability does arise.

The limitation-of-liability provision on page two of the Contract is enforceable under Massachusetts and Florida law and limits Pallet's recoverable damages to $875.00. *See L. Luria & Son, Inc. v. Alarmtec Int'l Corp.*, 384 So.2d 947, 947-48 (Fla.

Dist. Ct. App. 1980) (limitation of damages provision enforceable and would limit damages according to its terms); *Rollins, Inc. v. Heller*, 454 So.2d 580, 583 (Fla. Dist. Ct. App. 1984) ("[i]t is well settled that . . . limitation of damages provisions are valid and enforceable in [burglar alarm] . . . contracts"); *Florida Power & Light Co. v. Mid-Valley, Inc.*, 763 F.2d 1316, 1319 (11th Cir. 1985) (limitation of liability provision satisfied Florida's strict test applicable to cases where the indemnitee's sole negligence caused the damage).  Massachusetts law similarly enforces contractual limitation-of-liability clauses as long as the language is clear and unequivocal.  *See, e.g., Rohtstein Corp. v. KPMG, LLP*, Case No. 04-3517, 2007 WL 4416840, *2  (Mass. Super. Dec. 10, 2007) ("[c]ontractual limitation of liability clauses are enforceable under Massachusetts law.").

The limitation-of-liability clause in the Contract at bar clearly and unequivocally provides that SimplexGrinnell's liability is limited to an amount equal to the Agreement price allocable to the site where the incident occurred.   The Contract further provides that Pallet could select to purchase a rider whereby SimplexGrinnell would assume greater liability under the Contract, but Pallet did not exercise that option.  Any damages award pursuant to SimplexGrinnell's negligence must be limited according to the Contract.  Pallet argues that exculpatory clauses are disfavored in Florida, but does not otherwise argue why the limitation-of-liability clause should not be enforced.  Because the law is clear that limitation-of-liability clauses are enforceable and there is no reason why it should not be enforced in this

case, the aggregate of compensatory damages recoverable by Pallet for any claim it has against SimplexGrinnell is limited to $875.00.

Based on findings above and the very small recovery permitted against SimplexGrinnell, the Court finds it unnecessary to address the exculpatory clause, the one-year limitation-of-action provision of the Contract, or the question of causation with respect to the physical damages.   Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Third-Party Defendant SimplexGrinnell LP's Motion For Summary Judgment and/or Partial Summary Judgment **[DE 159] is GRANTED in part**.  To the extent Pallet can prevail on any claim it has against SimplexGrinnel, SimplexGrinnel's liability is limited to $875.00.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 25th day of June, 2009.

                KENNETH A. MARRA
                United States District Judge

copies to:

All counsel of record
Magistrate Judge Linnea R. Johnson